Joshua M. Lurie, Esq. (0788)
Lurie|Strupinsky, LLP
15 Warren Street, Suite 36
Hackensack, New Jersey 07601
(201) 518-9999 (main)
(347) 772-3074 (facsimile)
Attorney for Plaintiff

| | |
|---|---|
| NYC MEDICAL PRACTICE, P.C. d/b/a GOALS AESTHETICS & PLASTIC SURGERY, | UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK |
| Plaintiffs, | Civil Case No. |
| v. | COMPLAINT, JURY DEMAND AND DESIGNATION OF TRIAL COUNSEL |
| JOSEPH M. POBER, MD, FACS; POBER MD MEDI SPA, LLC (a New Jersey Limited Liability Company); JOHN DOES 1-10; and BUSINESS ENTITIES A-K, | |
| Defendants. | |

Plaintiffs, NYC MEDICAL PRACTICE, P.C. d/b/a GOALS AESTHETICS AND PLASTIC SURGERY ("Goals"), by way of complaint against the Defendants, says:

## PARTIES

1.     Plaintiff Goals is a New York professional corporation, incorporated pursuant to the laws of the State of New York, and having headquarters in Kings County, New York and its principal location in New York County, New York.

2.     Defendant Joseph M. Pober, MD, FACS ("Pober") is, upon information and belief a resident of the City of New York and New York County.  He is named herein in his personal capacity as well as in his official capacity as the sole owner or proprietor of a medical practice bearing his name located at 975 Park Avenue, New York, New York and also as the managing or

controlling member of Defendant Pober MD Medi Spa, LLC ("PMMS"), located in Ridgewood, Bergen County, New Jersey.

3.      The John Doe and Business Entity defendants are fictitious parties named herein because their identities are not currently known, and are used to represent the owners, operators, employees, directors, managers and individuals or business entities with controlling interests in Defendants, if any such exist and whom or which, after discovery, may be determined to be partially or otherwise responsible for the harm which the Plaintiffs suffered and therefore an amended Complaint would be necessary to name them.

## NATURE OF THE ACTION

4.      This is an action for copyright infringement pursuant to 17 U.S.C. § 504.  based on Defendants' theft, modification, unauthorized display, distribution, and copying of Plaintiff's copyrighted photographs during the time that Defendants provided services to Plaintiff under an independent contractor agreement.

5.      Further, this action is brought as a result of the method in which Defendants obtained the copyrighted materials which was by unauthorized access to Plaintiff's online EMR system which is where the subject photographs were kept in violation of the civil provisions of *the Computer Fraud and Abuse Act*.

6.      The common law claims arise under allegations of fraud and fraudulent conduct, violations and breaches of employment/consultant agreements, and for conversion.

7.      Many of the common law claims arise under the permissive joinder provisions of Fed.R.Civ.P. 20, as the issues therein are intertwined with the statutory and federal claims, and a full adjudication of all issue against all parties would simplify the claims, eliminate the risks of contradictory rulings, and would be in the best interest of justice and judicial efficiency.

## JURISDICTION AND VENUE

8.      This Court has Subject Matter Jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 as some of the claims herein arise out of violations of the *Copyright Act of 1976*, 17 U.S.C. § 101, *et seq*. including pursuant to sections 106 and 113 and for infringement pursuant to section 504.

9.      This Court also has Subject Matter Jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 as some of the claims herein arise out of violations of the civil provisions of *the Computer Fraud and Abuse Act*, 18 USC § 1030(g).

10.     The Court has Supplemental Jurisdiction, pursuant to 28 U.S.C. § 1367 for the New York statutory claims and the common law claims.  Similarly, the Court has Subject Matter Jurisdiction over the New York Business Law claims under 28 U.S.C. § 1338.

11.     The Court has personal jurisdiction over Defendant Pober as he is either a resident of the State and City of New York or his principal business is located within the State and City of New York.

12.     The Court has personal jurisdiction over Defendant PMMS as it has a physical or otherwise commercial presence in the State and City of New York.  Further, consistent with the applicable jurisdictional rules, the products and/or service to which the defendants have infringed upon are offered for sale in the State of New York through its New York presence.

13.     Venue is proper in this Judicial District under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claims herein are within this district.

14.     Further, venue is proper in this Judicial District as a result of the contractual agreement which is a subject of this matter granting exclusive jurisdiction to either the state or

federal courts located in Kings County, New York and, due to the federal claims to which this Court has exclusive Subject Matter Jurisdiction, this Judicial Venue is proper.

## FACTS

**A. The Background of the Agreement and Termination.**

15.     Goals is an established and reputable plastic surgery center which has experienced notable business growth during approximately the last year.

16.     An element of Goals' growth has been the result of a concentrated marketing program which includes, consistent with signed waivers from patients, the posting of "before and after" photographs of their patients on social media and elsewhere to show the quality of the services provided.

17.     Plaintiff has taken hundreds, if not thousands, of photographs which are designated to be used solely for its own benefit pursuant to the authorization of the patients of whom the photos are taken.

18.     As a result of the growth, Plaintiff sought additional, qualified, surgeons to perform surgeries on behalf of Goals either as employees or as independent contractors.

19.     Defendant Pober is an established and, at the time believed to be, reputable, plastic surgeon with an impressive professional resume which includes training at Ivy League schools and years of experience performing cosmetic and plastic surgery.

20.     What was confusing to Plaintiff, however, was that Pober advised that he did not have a sufficient amount of work and was, proverbially, hungry for more surgeries and income.

21.     Plaintiff and Pober entered into negotiations, and, on or about February 15, 2018, entered into a signed independent contractor's agreement which includes, *inter alia*, terms limiting the use of intellectual property of the Plaintiff's – including photographs – with liquidated damages

clauses included, as well as non-solicitation provisions as to Plaintiff's patients or prospective patients.  A copy of this agreement is attached hereto as **Exhibit A** and referred to hereafter as the "IC."

22.     Among the contract terms of which a breach could result in termination of the IC, includes the following:

a.   Section 3(C)(iii) ("The Practice may terminate this Agreement immediately upon . . . Determination Physician has engaged or is engaging in fraud");

b.   Section 13(C) (Representation that "The Physician is not currently being and has never been reprimanded, sanctioned, or disciplined by any licensing or accrediting board");

c.   Section 13(E) (Representation that "The Physician is not currently and has never been denied membership or reappoint of membership on the medical staff of any hospital, and none of his or her clinical privileged have ever been suspended, curtailed, or revoked"); and

d.   Section 13(G) (failure to notify Goals of actions by licensing or accreditation boards, and denial of membership to any hospital staff or suspension or curtailment thereto).

23.     On or about June 15, 2018, Plaintiff came to learn that the representations made by Pober were, in fact, false.  He was, as of April 27, 2018, under investigation and a complaint was filed against him by the New York State Department of Health, State Board for Professional Medical Conduct alleging multiple wrongful acts.  (**Exhibit B**).

24.     Therein, while not providing further information, set forth on Page 7, sets forth that Pober "concealed, with intent to deceive, that he was the subject of a professional misconduct

investigation on multiple applications for the reappointment to the medical staff of Saint Luke's Roosevelt Medical Center that he signed on . . ." on three dates long before Pober signed the IC.

25.     It is unknown what, specifically, these allegations of professional misconduct were, but they were not disclosed to Goals as required under the terms of the IC and were willfully concealed.

26.     Similarly, during the time to which Pober was providing services to Goals, innumerable complaints were made with respect to both his conduct, the quality of the services/surgeries, and his promptness – including many times that he would either fail to show up for surgeries for several hours after they were scheduled and he agreed to perform them, or did not show up at all resulting in a substitute having to perform such procedure.

27.     Many of the complaints from patients resulted in negative reviews of Goals, which Goals has been forced to address as a result.

28.     Thus, for these reasons, Goals terminated the IC agreement and banned Pober from its premises.

### B.   **Pober Immediately Begins to Violate the IC by Soliciting Patients and Prospective Patients**

29.     On or about July 16, 2018, about a month following Pober's termination, a patient who came to her appointment at Plaintiff's Manhattan office advised Plaintiff that she had referred her friend to Goals and provided the contact information for her "patient coordinator" named Courtney.  This person advised that, upon speaking to Courtney, who did not advise that she no longer worked for Plaintiff and, apparently, was hired by Pober, Courtney scheduled a consultation for this friend with Pober.

30.     Similarly, around the same time, another patient reached out to advise that after she submitted her documentation to Plaintiff, she was contacted by a Megin, who is known to be Megin

Klunk, Pober's assistant, advising her to cease seeking service from Plaintiff and to go to Pober's office on Park Avenue instead.

31.     Section 5 of Schedule D of the IC (the non-solicitation agreement) bars Pober from, during the term of being retained as an independent contractor and for a period of two years thereafter, not to solicit any of Plaintiff's patients or prospective patients.

32.     It is unknown how many other patients or prospective patients have been solicited by Pober or his staff to cease seeking services from Plaintiff and, instead, obtain services from Pober.  However, based upon the fact that, in such a short period of time, two prospective patients were solicited by two different staff members of Pober to seek his services, with one of these individuals being a former employee and subject to her own non-compete agreements, it is, upon information and belief, a small sampling of patients or prospective patients who have been solicited by Pober.

### C. **Pober and PMMS Violate Plaintiff's Copyrights and Break Into Plaintiff's EMR system**

33.     Upon realization to Pober has been violating Plaintiff's rights pursuant to the IC, Plaintiff went to Pober's website which is shared by both Pober and PMMS.

34.     Upon viewing the website, Plaintiff was shocked.  Contained thereon were links to Instagram photographs.  Two of those photographs were Plaintiff's patient before and after photos, both the front and back, yet modified as discussed below.

35.     These are unposted and unpublished photographs which were only present within Plaintiff's Electronic Medical Records software. These photographs have not yet been used by Plaintiff for any marketing purposes. Thus, to obtain a copy, one would have to manually break into, or otherwise access Plaintiff's EMR system and steal such pictures.

36.     Upon "clicking" on the photographs on Pober's website to follow their links, Plaintiff was brought to Megin Klunk's Instagram page where she identified that she was advertising for and on behalf of Pober and PMMS.  That it was also on Pober and PMMS's website evidences Pober's and PMMS's intent to advertise with such pictures.

37.     These pictures are the intellectual property of Plaintiff and subject to their copyright under Copyright Numbers 1-6776553451 and 1-6776392597.  However, the ones on Defendant's website are "altered."

38.     Attached hereto as **Exhibit C** is the original of the "rear" photograph of Plaintiff's patient and as copyrighted.  Attached hereto as **Exhibit D** is the infringed and altered photograph by Defendants.  Similarly, **Exhibit E** is the original of the "front" photograph of Plaintiff's patient and copyrighted and **Exhibit F** is the infringed and altered photograph by Defendants.  They have been minimized as much as possible to protect the patient privacy and to remove any identifying information.

39.     There are two alterations as to both photographs by Defendants - one is more striking than the other.

40.     As a less striking act, Defendants covered Plaintiff's logos on the photographs and placed, as to the rear side photographs, a hot and cold symbol and, with the front side photographs, happy and sad faces.  Notwithstanding, this alteration is not approved and is improper.

41.     The more striking alteration is that Defendants literally "white washed" the photograph by altering the skin color of the patient from black (the vast majority of Plaintiff's patients are African American) to white (which coincides with Defendants' target patients).

42.     Pursuant to Section 106 of the Copyright Act of 1976, Plaintiff has the exclusive right to do and to authorize the reproduction or prepare derivative works of its copyrighted photographs.

43.     Similarly, under the Copyright Act, only the Plaintiff is entitled to obtain monetary value from its copyrighted works.  However, through the infringement and advertisement thereof, and upon information and belief, combined with the violations of the non-solicitation terms as discussed above, Defendants have obtained significant economic benefit from the use of the copyrighted systems.

44.     Even if not directly involved, Pober has acted and contributed to the infringement by knowing of the infringing activity and induced, caused, or materially contributed to the infringing conduct of others, including, but not limited to the individuals named above.

45.     Similarly, both Pober and PMMS are liable for vicarious copyright infringement because they had the right and ability to supervise the infringing conduct by others and obtained an obvious and direct financial interest in the infringement.

46.     Further, in order to further the infringing conduct, Defendants violated the Computer Fraud and Abuse Act by, after having authority to access a computer system revoked, logging into Plaintiff's EMR system and accessing protected medical records and stealing from therein these copyrighted photographs.

47.     Indeed, in furtherance of his duties as an independent contractor for Plaintiff, Pober was given access to Plaintiff's EMR software which has an online portal.

48.     Upon information and belief, subsequent to the revocation of access, Pober, or someone on his behalf, including his staff and/or Ms. Klunk, who, upon information and belief,

did so under the direction of Pober, accessed Plaintiff's EMR software and viewed patient records, potentially copied records, and copied these photographs.

49.     Such conduct is a clear and direct violation of 18 USC § 1030(g) which specifically references the violation occurs if the access includes medical records and that such access either impairs or has the potential to modify or impair treatment medical examination, diagnosis, treatment or care.  By accessing these records, a serious risk of impairment for treatment resulted since, notwithstanding that Plaintiff is only aware of photographs being taken, it is unknown what other records were accessed or downloaded by Defendants during this time.

50.     As Plaintiffs are aware that Defendants are contacting their patients and potential patients, the contact information would be readily accessible through such improper accessing of Plaintiff's EMR systems.

51.     Thus, by virtue of the conduct of Defendants as set forth herein, Plaintiff has been harmed and otherwise damaged and seeks remedies as permissible under the applicable laws and contractual obligations therein.

## Count One
**(Violation of the Civil Provisions of the Computer Fraud and Abuse Act)**
**(18 U.S.C. § 1030(g))**
**(Against Defendant Pober)**

52.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

53.     Defendant Pober was provided with user names and passwords to access Plaintiff's EMR system which was solely for the purposes of treating patients while retained by Plaintiff.

54.     The Agreement makes clear that the records and the patients are those of the Plaintiff and not Pober, and that Pober.

55.     Upon termination, the right and authorization to access those systems was revoked.

56.     After termination, Pober, or someone on his behalf, remotely accessed the system and, in the very least, copied and otherwise stole photographs of patients which are the property of Plaintiff and subject to copyright.

57.     The conduct of Pober in accessing these systems after access was revoked was to cause damage to Plaintiff and financial gain to Pober.

58.     Pober's conduct has caused damage to Plaintiff, either intentionally, negligently or recklessly.

59.     Pober's conduct modified and/or impaired treatment medical examination, diagnosis, treatment or care of patients of Plaintiff.

60.     Similarly, Pober's conduct interferes with Plaintiff's rights as to their patients and the non-solicitation obligations of Pober as to Plaintiff's patients.

61.     Therefore, as a direct and proximate result of Defendants' conduct as set forth herein, and as a result of Pober's conduct, Plaintiff has suffered financial damages in and amount to be determined at trial, but no less than, and in excess of $5,000.00.

62.     Similarly, equitable relief is necessary to bar Pober from further accessing those records/systems.

### Count Two
### (Violation of the Copyright Act of 1976)
### (As to Pober and PMMS)

63.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

64.     As set forth above, Plaintiff owns a valid copyright over the photographs which are subject to copyright protection, are original, copyrightable, and was not transferred, licensed, or otherwise permission granted to Pober or PMMS.

65.     Pober and PMMS have stolen these photographs and beginning in at least July of 2018, and continuing to date, the Defendants utilized and/or copied these copyrighted works, and modified them without permission notwithstanding that Plaintiff has the sole and exclusive right to either modify or grant the right to do so, by placing them on their web page, their Instagram pages, and otherwise and use these modified/altered versions of Plaintiff's copyrighted photographs for their own financial gain and advertisement.

66.     The utilization of Plaintiff's copyrighted materials by Defendants, including the alternations of the photographs and dissemination thereof, has infringed on Plaintiff's copyrights and, as a result, has harmed and damaged Plaintiff.

67.     Further, the methods to which the copyrights were infringed evidence willful and intentional conduct.

68.     Therefore, as a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff seeks damages against Defendants, jointly and severally, in the maximum amount permissible under 17 U.S.C. § 504, for $300,000.00 plus attorneys' fees and costs pursuant to 17 U.S.C. § 505 along with an order for an equitable accounting for a determination of income derived from such misappropriation and an award of such actual damages and profits as a result of the infringement.

**Count Three**
**(Contributory Copyright Infringement)**
**(As to Pober)**

69.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

70.     Even if Pober himself did not infringe upon Plaintiff's copyrights, he is liable for contributory infringement of Plaintiff's copyrights as he knew of the infringing activity and induced, caused, or materially contributed to the infringing conduct of others.

71.     Therefore, as a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff seeks damages against Defendants, jointly and severally, in the maximum amount permissible under 17 U.S.C. § 504, for $300,000.00 plus attorneys' fees and costs pursuant to 17 U.S.C. § 505 along with an order for an equitable accounting for a determination of income derived from such misappropriation and an award of such actual damages and profits as a result of the infringement.

### Count Four
### (Vicarious Liability for Copyright Infringement)
### (As to Pober)

72.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

73.     Even if Pober himself did not infringe upon Plaintiff's copyrights, he is liable for vicarious copyright infringement of Plaintiff's copyrighted works as he had the right and ability to supervise the infringing conduct by others and obtained an obvious and direct financial interest in the infringement.

74.     Therefore, as a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff seeks damages against Defendants, jointly and severally, in the maximum amount permissible under 17 U.S.C. § 504, for $300,000.00 plus attorneys' fees and costs pursuant to 17 U.S.C. § 505 along with an order for an equitable accounting for a determination of income derived from such misappropriation and an award of such actual damages and profits as a result of the infringement.

**Count Five**
**(Breach of Contract)**
**(As to Pober)**

75.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

76.     Plaintiff and Pober entered into a binding agreement to which Pober agreed to certain terms and conditions as an independent contractor including barring solicitation of Plaintiff's patients and intellectual property provisions including client "before and after" photographs.

77.     Under the terms of the contract, as to the intellectual property, Defendant agreed that, for each violation, injunctive relief, liquidated damages in the amount of $100,000.00 per violation (since the harm other than actual statutory damages are hard to quantify) of the IP rights for a total of $200,000.00 along with counsel fees and costs.

78.     Similarly, due to the improper solicitation, additional harm may have come from the loss of income in an amount to be determined at trial and, in no event, less than $50,000.00.

79.     Therefore, as a direct and proximate result of Pober's conduct, as set forth herein, Plaintiff has been damaged in an amount to be proven at trial, but at least $250,000.00 plus counsel fees and costs.

80.     Further, as a result of the conduct of Pober, Plaintiff is entitled to a full accounting of all income Pober and, through Pober's conduct, PMMS derived from the violations as set forth herein.

## Count Six
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (As to Pober)

81.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

82.     The conduct, as set forth above, including the acts and omissions of Pober as to the terms and conditions of his Agreement with Plaintiff, and his conduct thereafter, constitute a breach of the obligation to act in good faith and deal fairly with Plaintiff.

83.     Therefore, as a direct and proximate result of Pober's conduct, as set forth herein, Plaintiff has been damaged in an amount to be proven at trial, but at least $250,000.00 plus counsel fees and costs.

84.     Further, as a result of the conduct of Pober, Plaintiff is entitled to a full accounting of all income Pober and, through Pober's conduct, PMMS derived from the violations as set forth herein.

## Count Seven
### (Tortious Interference)
### (As to all Defendants)

85.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

86.     As set forth above, in at least two occurrences, Defendants utilized information that was in their possession to, *inter alia*, solicit patients who were directly seeking services from Plaintiff and attempted to divert their business to Defendants.

87.     This interference was done with the intention to interfere with Plaintiff's rights to contract with its patients and, in fact, to misrepresent and thereafter direct the intended business to Plaintiff to Defendants.

88.      The interference was intentional and without justification.

89.      As a direct and proximate cause of Defendant's interference, Plaintiff has been damaged in an amount to be proven at the time of trial, but not less than $100,000.00 plus punitive damages and interest.

**WHEREFORE**, Plaintiff NYC Medical Practice, P.C., d/b/a Goals Aesthetics and Plastic Surgery respectfully requests that the Court enter judgment in its favor, and against the Defendants, jointly and severally as applicable, as follows:

A.  Liquidated damages in the amount of $200,000.00;

B.  Compensatory damages of at least $5,000.00 on the CFAA claims;

C.  Awarding statutory damages, pursuant to 17 U.S.C. § 504 for willful infringement in the amount of $300,000.00;

D.  Awarding an equitable accounting of Defendants' records;

E.  Awarding actual damages and profits from Defendants' infringement pursuant to 17 U.S.C. § 504;

F.  Awarding damages for all amounts wrongfully obtained by Defendants from their use and infringement of Plaintiff's copyrights, including any income derived therefrom;

G.  Awarding counsel fees and costs of suit as provided by 17 U.S.C. § 505;

H.  Compensatory damages for the breaches of contract claims;

I.  Compensatory damages for the fraud claims;

J.  Compensatory damages for the tortious interference claims; and

K.  Any other such relief as the Court deems just and appropriate.

## <u>JURY TRIAL DEMAND</u>

Pursuant to <u>Fed.R.Civ.P.</u> 38(b), Plaintiffs hereby demand a jury trial on triable issues raised

by this complaint.

Dated: September 14, 2018

           ___/s/ Joshua M. Lurie_____

           Joshua M. Lurie, Esq. (JL7272)
           Lurie|Strupinsky, LLP
           15 Warren Street, Suite 15
           Hackensack, New Jersey 07601
           Ph. (201) 831-1086
           Fax. (347) 772-3074
           jmlurie@luriesrupinsky.com

E
X
H
I
B
I
T

A

# EXHIBIT A

<u>INDEPENDENT CONTRACTOR AGREEMENT</u>

THIS AGREEMENT (the "Agreement"), made this <u>8th</u> day of <u>February</u>, 20.1§., by and between, NYC MEDICAL PRACTICE, P.C. d/b/a Goals Aesthetics & Plastic Surgery, a New York corporation having its principal place of business at 2792 Ocean Avenue, 2nd Floor, Brooklyn, NY 11229 (the "Practice") and <u>Dr. Joseph M. Pober</u>, an individual residing at the ___975 Park Ave NY, NY 10028_____(the "Physician") (each being referred to as a "Party" and may be referred to collectively as the "Parties").

WHEREAS, the Practice is a provider of medical services as defined under the laws of the State of New York and the United States, located in Brooklyn and Manhattan, New York, and primarily engaged in the practice of plastic and cosmetic surgery; and

WHEREAS, the Physician is a licensed physician under the laws of the state of New York as well as a Plastic and Reconstructive Surgeon, subject to Board Certification; and

WHEREAS, it is deemed to be to the mutual advantage of the Practice and the Physician to create the within agreement for the mutual benefit of both parties; and

NOW, THEREFORE, in consideration of the mutual promises contained herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the reasons set forth and in consideration of the covenants and promises of the parties hereto, parties agree as follows:

2.   EFFECTIVE DATE AND TERM. All the parties' rights and obligations under this Agreement shall be effective as of <u>February , 2018</u>, and shall continue for a term of One (1) Year, until the termination of this Agreement (the "Term"). This initial Term shall extend for additional terms of One (1) Year by mutual written and signed agreement of the Parties subject to the terms and conditions herein unless modified by a subsequent writing which shall be incorporated into this and any other subsequent agreements as set forth hereinbelow.

3.   TERMINATION. Termination. This Agreement may be terminated as follows:

A.   Without Cause. The Practice or Physician may terminate this Agreement at any time, without cause, upon thirty (30) days written notice to the other Party. Failure to notify the other Party of the intent to terminate without cause within the 30-day period shall be deemed a breach subject to the terms of this Agreement.

B.   With Cause. Either Party may terminate this Agreement for material breach of any of the terms, conditions or provisions of this Agreement with at least fifteen (15) days' prior written notice to the other Party specifying the nature of the basis for termination and/or breach of this Agreement. During the fifteen (15) day notice period, the breaching Party will have the opportunity to cure the breach, to the extent possible, to the reasonable satisfaction of the non-breaching Party.

C.   Immediate Termination. The Practice may terminate this Agreement immediately upon written notice to the Physician in the event of any of the following:

   i.   Death or disability of Physician; suspension, revocation, condition, expiration or other restriction of the licensure, certification and/or accreditation of Physician to perform services contemplated under this Agreement;

   ii.   Suspension or bar of Physician from participation in federal health care programs;

   iii.   Determination Physician has engaged or is engaging in fraud;

NYC Medical Practice, P.C. - Independent Contractor Agreement (Dr. Pober)

iv. Non-compliance with the general and professional liability insurance requirements set forth in the Agreement;

v. Felony conviction or guilty plea in connection with indictment or charges alleging commission of a felony;

vi. The return of an indictment against the Physician which raises questions about their ability to perform medical services, or may place a financial risk to the Practice, such as the improper prescribing of medicine which is defined as a controlled substance under Federal or State law, or the sexual harassment or assault of a patient. This list is non-inclusive and shall be subject to the discretion of the Practice; or

vii. The Practice's or Physician's reasonable determination, in the sole discretion of the Practice or sole discretion of the physician, that ~~assigned~~ Physician's immediate termination is necessary for the health and safety of its patients.

D. **Obligations Upon Termination.** Upon termination of this Agreement for any reason whatsoever, Physician will continue to provide services to patients, as necessary, and to cooperate with the Practice to transition patients to other physicians in a manner that ensures medically appropriate continuity of care. The terms of this Agreement, including the compensation amounts set forth herein, shall apply to Physician's provision of such post-termination services. Likewise, upon terminaton, the Practice will cooperate in providing services to Physician's patients, as necessary, to ensure medically appropriate care and refunds, free revision services to patients, as per customary and usual protocol to avert conflict, etc. Under all circumstances, the Practice shall indemnify and defend the Physician with respect to any acts by any employee or person other than said Physician which leads to negative consequence to Physician or Practice or requires reportage to his or Practice's medical malpractice carrier. . Under all circumstances independent of what is contained anywhere in this agreement, upon termination, no further responsibility or liability to Practice whatsoever will be received or sought in any fashion from the Physician apart from his providing care as needed to patients he had operated on, which time will always be available to him during working and other reasonable hours.

3. INDEPENDENT CONTRACTOR STATUS.

A. The Physician shall be deemed an independent contractor associated with the Practice and not an employee or partner of the Practice. As such, Physician shall have the freedom to accept or reject work offered by the practice and shall set his or her own hours of work at the Practice and time away from the Practice.

Similarly, nothing herein shall bar the Physician from providing a substitute for certain services as provided by the Practice, if Physician is not available to provide these services as requested, although Practice shall have the sole and exclusive right to reject any substitute Physician. Any intended substitute shall be bound to the terms herein and equally or similarly qualified as Physician, if such substitute is provided solely by the Physician as an outside physician.

Any intended substitute from Physician shall be identified and said qualification provided to Practice no less that fourteen (14) days prior to the intended substitution to permit the Practice to consult with said substitute to determined, in their sole discretion, whether they will permit substitute to perform the services of Physician. Physician shall be solely responsible for ensuring that the terms and conditions herein are complied with by any substitute and shall indemnify and defend the Practice with respect to any acts by any substitute.

B. The Physician shall not be treated as an employee with respect to the services performed hereunder for federal or state tax purposes. The Physician shall provide to the Practice an IRS Form W9 concurrent with the execution of this Agreement and shall be paid on an IRS Form 1099 basis and the Practice will not withhold any Federal, State or Local Income Taxes, Social Security, Unemployment Taxes for Physician or make any other employment related with holdings from any funds paid to the Physician by the Practice, regardless of the source of the funds.

The Physician is PERSONALLY responsible for, and agrees to pay; any and all such taxes and amounts due and will maintain all expense records as required by law. The Physician agrees to indemnify and hold the Practice harmless for any and all liabilities or costs related to the aforementioned employment related withholdings and/or payments and further indemnify and defend

the Practice for any legal action related to any such potential issues which may arise subject to the terms and conditions of this Section 3 of this Agreement.

C. In an independent contractor relationship, **the Practice** provides no Worker's Compensation, **disability or Unemployment Insurance coverage of any kind for the Physician.** The Physician is hereby notified that if Workers Compensation, disability, or Unemployment Insurance coverage is desired, the Physician must personally obtain coverage directly from a licensed insurance carrier at the Physician's sole expense.

4. **WORK LOCATION.** As an independent contractor of the Practice, the Physician shall be granted a limited license, for the duration of this Agreement, to conduct all patient/client consultations and procedures at of the offices of the Practice.

5. **NO EXCLUSIVITY.** Nothing herein shall bar the Physician from providing medical services as either an employee of, or in any other relationship to, any other health care provider. Nothing in this Agreement shall prevent the Practice from working with other physicians. or in his own private practice.

6. **COMPENSATION.** The Physician will be compensated on a per procedure basis in accordance with the Compensation Schedule attached to this Agreement as <u>Schedule A</u>, which is incorporated into this Agreement.

7. **FEES FOR SERVICES.** Notwithstanding anything to the contrary, the Physician shall have no ownership interest in any amounts owned or collected by the Practice for medical services performed by the Physician pursuant to this Agreement. The Physician hereby unconditionally assigns to the Practice all amounts owned or collected for medical services performed by the Physician during the Term, or any subsequent term(s), and shall assist the Practice in billing and collecting such amounts only in so far a providing the technical surgical service, which shall be the sole and exclusive property of the Practice. Upon request of the Practice, the Physician shall execute and deliver such additional documents and instruments as may be necessary to evidence or effect the assignment of fees, including without limitation, any documents necessary in order to allow the Practice to bill and collect all amounts owed for medical services performed from any insurance carrier or any other third-party payors.   There will be no billing involvement by the physician in any fashion whatsoever. Fees for service is the full domain solely of the Practice.

8. **DUTIES.** The Practice shall designate the patients/clients to which the Practice requests that the Physician consult with and/or to perform any desired and advisable medical and surgical procedures on said patients/clients, as well as any required pre- and post-operative care. Subject to the terms herein, Physician has the right to reject providing services to any patient for any reason subject to the terms herein.

9. **MEDICAL RECORDS.** The Physician agrees to complete all required charting in the medical record of every patient/client serviced by the Physician in a prompt and timely manner and in accordance with any applicable policies and procedure of the Practice (a copy of which shall be provided to the Physician but was not provided as yet so cannot be considered part of this agreement until received and accepted after proper review.   the execution of Agreement shall not constitute acknowledgment of receipt and review of said policies and procedures, until such as recieved). The ownership and right of control of all reports, records and supporting documents prepared in connection with the services contemplated herein shall vest exclusively with the Practice and shall remain, at all times available to the physican for seven years at least, at the office where services are provided. provided, however, that

the Physician shall have such right of access to such reports, records and supporting documentation as necessary for the provision of professional services under this Agreement for at least seven years or as otherwise required by law..

10.   **COMPLIANCE.** Physician shall at all times comply with all Applicable Law including, without limitation: (a) the Social Security Act and its implementing regulations; (b) CMS regulations, instructions, guidance, and memoranda, including all CMS accountability provisions (42 CFR 422.504(i)(3)(ii) and 422.504(i)(4)(v)); (c) the Health Insurance Portability and Accountability Act ("HIPAA") and its implementing regulations; (d) the Health Information Technology for Economic and Clinical Health and regulations promulgated thereunder ("HITECH Act"); (e) the federal Anti-Kickback Statute, as codified in 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute"), and State equivalents; (f) the federal prohibition against physician self-referrals of Medicare patients, as codified in 42 U.S.C. § 1395nn ("Stark Law"), and State equivalents; (g) the False Claims Act, as codified in 31 U.S.C. §§ 3729-3733, and State equivalents; (h) the Deficit Reduction Act of 2005 and its implementing regulations; (i) all applicable State laws and regulations, and any State laws regarding patients' advance directives as defined in the Patient Self Determination Act (P. L. 101-58); and all standards, rules and regulations of all accreditation bodies which have jurisdiction over the subject matter of this Agreement or the Parties' performance of their duties hereunder. The list above is non-exclusive and Physician agrees to comply with all applicable laws and, if necessary, assist the Practice with respect to these and any other obligations as required by any state or federal law.

11.   **FRAUD AND ABUSE.** Physician shall at all times comply with all federal and state fraud and abuse laws and regulations including, but not limited *to,* the Anti-Kickback Statute, Stark Law, and the False Claims Act.

12.   **NON-DISCRIMINATION.** Physician shall render services to all patients in the same manner, in accordance with the same standards, and within the same time availability, as to its other patients. Neither Provider nor the Practice, shall refuse to render services to any patient based on the patient's race, age, sex, sexual orientation, national origin, religion, color, health status or handicap, Benefit Plan or source of payment. Except if health status or handicap, impacts negatively on proper surgical results. The patient always has the option to seek alternative care for cosmetic services such as those only provided by Physician.

13.   PHYSICIAN' S REPRESENTATIONS. The Physician represents and warrants that:

   A. The Physician is a qualified physician duly licensed to practice medicine in New York State.

   B.   The Physician's license or certification in any state is not currently being and has never been suspended, revoked, restricted, or deemed to be probationary;

   C.   The Physician is not currently being and has never been reprimanded, sanctioned, or disciplined by any licensing or accrediting board;

   D.   There are no pending professional liability actions against the Physician and there has never been entered against him a final judgment in a professional liability action and no action, based on an allegation of professional liability. Any malpractice by the him has been settled by payment to the plaintiff in full compliance with his medical malpractice insurer;

E.  The Physician is not currently and has never been denied membership on the medical staff of any hospital, and none of his or her clinical privileges have ever been suspended, curtailed, or revoked;

F.  As of the date hereof, the Physician has been the subject of open report or disclosure to the National Practitioner Data Sank ;

G. Throughout the Term, the Physician and   Practice shall immediately notify the Practice and Physician, respectively, when relevant to any patient served by Physician in the event of any:

   i. Suspension, revocation or restriction of any state license or certification;

   ii. Reprimand, sanction or disciplinary action by any licensing or accreditation board;

   iii. Professional liability actions;

   iv.  Denial of membership or reappointment to any affiliated hospital or the suspension or curtailment of any clinical privileges; and

   v.  Report or disclosure against him to the National Practitioner Data Sank.

H.  Throughout the Term of this Agreement, the Physician and Practice   shall be solely responsible for keeping his or her medical license and medical credentialing current and effective and shall be solely responsible for any renewal fees.

**14.   COURSE OF CONDUCT.**

A.  The Physician agrees to act in a competent and professional manner in carrying out his or her duties under this Agreement and agrees that he or she shall make all clinical decisions using his or her best medical judgment consistent with the most current standards in the industry.

B.  The parties agree to conform to, and abide by, all laws, rules and regulations, codes of ethics, and policies that are binding upon or applicable to physicians in the State of New York.

C.  The Physician agrees to conduct his or her business in accordance with the rules, policies and procedures of the Practice. when in full compliance with relevant laws and standards of care

15.   **MALPRACTICE INSURANCE.** Throughout the Term of this Agreement, the Physician shall procure professional malpractice insurance with coverage of <u>at least</u> One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) aggregate. *↑ covered by each party's respective insurance for med mal only to degree of coverage provided by his medical malpractice coverage*

16.   **INDEMNIFICATION.** To the extent permissible by law.

A.  The Physician agrees to indemnify and hold harmless the Practice, its principals, employees, officers, agents and representatives from, and against, any losses, costs, damages, and expenses resulting from claims for bodily injury arising out of the Physician's services under this Agreement. Likewise The Practice   agrees to indemnify and hold harmless the Physician, its principals, employees, officers, agents and representatives from, and against, any losses, costs, damages, and expenses resulting from claims for bodily injury arising out of the Practice's services under this Agreement *to similar degree a noted for physician or to degree of their med mal coverage of malpractice*

B.  The Physician agrees that in no event including, but not limited to, nonpayment by Practice, the Practice's determination that services were not Medically Necessary, the Practice's insolvency, or the Practices' breach of this Agreement, shall Physician bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against any patient of the Practice, or persons other than the Practice acting on any patient's behalf, for amounts that are the

5 of 23

legal obligation of Practice. The Parties agree that this provision shall be construed for the benefit of patients. Likewise, refunds paid to patients shall not be expected to be remunerated to Practice by Physician, for obvious reasons.

17.   AUTHORIZATION TO WORK IN THE UNITED STATES. The Physician represents and warrants that he is authorized to legally work in the United States and shall immediately furnish proof of the same to the Practice.

18.   MISCELLANEOUS PROVISIONS.

A.   Integration. This Agreement and the attached Schedules A-D, which are incorporated by reference, contain the entire understanding between the parties and supersedes any prior discussions negotiations, agreements or understandings.

B.   Amendments. This Agreement may not be altered, amended, canceled, revoked or otherwise modified except by written agreement subscribed by the Physician and the Practice.

C.   Survival and Modification of Provisions. In the event that anyone or more of the provisions or portion of any provision of a provision of this Agreement is held to be invalid, unlawful or unenforceable, the invalid, unlawful or unenforceable provision (or portion thereof) shall be construed or modified so as to provide the Parties with the maximum protection that is valid, lawful and enforceable, consistent with the intent of the Physician and Practice in entering into this Agreement. If such provision (or portion thereof) cannot be construed or modified so as to be valid, lawful and enforceable, that provision (or portion thereof) shall be construed as narrowly as possible and shall be severed from the remainder of this Agreement (or provision), and the remainder shall remain in effect and be construed as broadly as possible, as if such invalid, unlawful or unenforceable provision (or portion thereof) had never been contained in this Agreement.

D. Notices. All required notices must be in writing and will be considered given when delivered: ONLY

By certified mail, return receipt requested signed solely by relevant party , addressed as follows (or any other address that is specified in writing by either party):

*/fto Practice:* NYC Medical Practice, P.C., 2792 Ocean Ave, 2nd Floor, Brooklyn, NY 11229

*/fto Physician:* 975 Park Avenue, New  York, NY 10028 _____ ; or

i      _

E.   Waiver. The failure of a Party to insist upon strict performance of any obligation or provision of this Agreement shall not be construed as a waiver thereof nor deprive that Party of the right thereafter to insist upon the strict performance of any obligation or provision of this Agreement.

F. **Remedies.** The remedies provided in this Agreement and the attached schedules are cumulative. Unless otherwise specified, a party who asserts a right or seeks a remedy may also assert other rights or seek other remedies.

G. **Headings and Syntax.** The headings set forth in this Agreement are for convenience and reference only and are not intended to modify, limit, enlarge, describe or affect in any way the content, scope or intent of this Agreement. All references made, and pronouns used, shall be construed in the singular or the plural and in such gender as common sense and circumstances indicate and require.

H. **Construction and Interpretation.** This Agreement shell be deemed as having been prepared by the joint efforts of the Parties. The Parties acknowledge and agree that the usual rules of construction, to the effect that ambiguities in a document are to be resolved against the drafting party, shall not be employed in the interpretation of this Agreement and that this Agreement shall be construed as if jointly prepared by all Parties.

I. **Choice of Law and Venue.** This Agreement and any other documents referred to herein shall be governed by, construed, and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles. Any disputes, whether related to the enforcement or interpretation of any clause or provision herein shall be adjudicated in the State or Federal Courts located in Kings County, New York.

J. **Further Assurance.** Physician and Practice agree to execute such other documents and to take such other action as may be reasonably necessary to further the purposes of this Agreement.

K. **Organization and Authority.** Each of the Parties represents and warrants, with respect to itself or himself or herself only, that:

    i. if such a party is an entity:

        a. it is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and organization; and

        b. it has the requisite power and authority to enter into this Agreement and to perform all its, as applicable, obligations under this Agreement;

ii. the execution and delivery of this Agreement and the performance by such party of its obligations under this Agreement has been authorized by all requisite action on its part;

iii. there are no other persons or entities whose consent or joinder to this Agreement is necessary to make fully effective those provisions of this Agreement that obligate, burden, bind or apply to it or him/her, as applicable; and

    iv. it or he/she, as applicable, has not transferred, assigned, or ledged to any third party, any right set forth in this Agreement.

L. **Consents and Approvals; No Violations.** Each of the Parties represents and warrants, with respect to itself only, that neither the execution nor the delivery of this Agreement by any such Party, nor the performance by any such Party or its obligations hereunder will:

    i. Violate the certificate of incorporation, by-laws, or any other organizational document of such party;

b. Conflict in any material respect with or result in a material violation or breach of or constitute a material default under, any material contract, agreement, or instrument to which such a Party is a party; or

iii. Violate or conflict in any material respect with any rule, regulation, judgment, order or decree of any court, administrative agency or governmental authority applicable to such party.

M. **No Third-Party Beneficiaries.** No provision of this Agreement will be deemed to be construed in any way to result in the creation of any right or obligation in any person or entity not a party to this Agreement or not identified in this Agreement.

N. **Independent Attorney Review.** Each of the Parties represents that, before executing this Agreement, each such Party has read this Agreement thoroughly, Physician has not yet consulted with legal counsel, and understands the gist of the meaning and effect of this Agreement. Each of the Parties further represents that, in executing this Agreement, each such Party is reasonably cognizant of the rights being granted and/or relinquished pursuant to this Agreement and the consideration therefore. Additionally, should either Party to this Agreement fail or otherwise not have an attorney review this Agreement, the Party agrees and acknowledges that the failure to have an attorney review the document before execution is done on their own free will to expedite providing cosmetic plastic surgery procedures and taking full responsibility for their part in that provision as noted (the Phsycian provides surgical procedures and evaluates the patient for only aspects relevant to such surgical procedures and not the general health and well being of the patient ) , nobody forced them to execution this contract without the benefit of attorney review, they agree to be bound to the terms, and, should any dispute arise, they agree and understand that they waive and shall not use the argument or defense that they executed this Agreement lacking attorney consultation. The failure to retain or rely upon an attorney prior to the execution of this Agreement, each party agrees and acknowledges, is a full waiver of the right to counsel review. Again, all terms of this agreement become null and void within the aforementioned times for termination( up to a maximum of thirty days) , except for continued provision of required surgical care to patients operated on by Physician relevant only to his surgery.

**The Undersigned enter this Independent Contractor Agreement knowingly and voluntarily and do so with the full authority of the Undersigned, and if a business entity, with the fully authority to so bind said entity.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the first date written above.

**PRACTICE:** NYC Medical Practice, P.C.                    **PHYSICIAN:** Dr. Joseph M. Pober

8y: _____ _          X _____ _

Sergey Voskin, MD
*President*

Attachments:
    *Schedule A: Compensation Schedule*
    *Schedule B: HIPAA Confidentiality Agreement and Training Attestation*
    *Schedule C:Confidentiality Agreement, Intellectual Property & Trade Secrets Agreement*
    *Schedule 0:Non-Solicitation Agreem*

NYC Medical Practice, P.C. - Independent Contractor Agreement (Dr. Pober)

<u>SCHEDULE A: COMPENSATION SCHEDULE</u>

Physician will be compensated on a per procedure basis as follows:

$2500 per rhinoplasty
$1100 per lower bleph
$1500 per upper bleph
$1000 per bullhorn lift
$1 000 per buccal fat pad
$3500 per lower facelift

As per the Independent Contractor Agreement (the "Agreement") to which this Schedule A is attached, Physician shall be paid on an IRS Form 1099 basis and **the Practice will not withhold any Federal, State or Local Income Taxes, Social Security, Unemployment Taxes for Physician or make any other employment related withholdings from any funds paid to the Physician by the Practice, regardless of the source of the funds.**

Physician shall be paid by Practice check on Fridays, bi-weekly, or more frequently, if requested by the Physician or necessary to the Practice.

AGREED AND ACCEPTED: _____ (PhYSician's Initials)

## SCHEDULE B: HIPAA CONFIDENTIALITY AGREEMENT AND TRAINING ATTESTATION

*This HIPAA Confidentiality Agreement   solely applies to HIPPA and applies nothing else in schedule c matters whatsoever in any respect, regardless of what might be contained herein.   However, appropriately, The HIPPA Confidentialiyt Agreement   applies to all NYC Medical Practice, P. C. d/b/a Goals Aesthetics & Plastic Surgery ("Goals") **Workforce Members,** including: employees, independent contractors, medical staff and other health care professionals; volunteers; agency, temporary and registry personnel; and house staff, students, and interns.*

### HIPAA PROTOCOL AND PROCEDURES FOR ALL GOALS WORKFORCE MEMBERS

Goals is committed to maintaining the strictest privacy and confidentiality standards in the use and handling of any and all medical information we have access to.

The Privacy Rule of the Health Insurance Portability and Accountability Act (HHIPAA") governs the use and release of patient identifiable information by health care providers. The Office of Civil Rights is charged with the responsibility for the Privacy Rule part of the law.

Because information is so readily available bye-mail, fax, internet, electronic records it can easily be obtained by people that do not need tom know the information and could potentially misuse the information. HIPAA's privacy rule addresses the following:

1. Greater restrictions for the use and disclosure of personal health information.
2. Patients have more access to and control and protection of their health information.
3. Establishes appropriate safeguards that healthcare providers must achieve to protect the privacy of health information.
4. Holds violators accountable with criminal and civil penalties that can be imposed if they violate patient's privacy rights.
5. Balances public responsibility to disclose some forms of data to protect public health.

All Workforce Members of Goals are considered "covered" entities, that is, a people or organizations that have access to protected health information and share that information electronically. As such, **every Workforce Member. including Employee. is required to follow the HIPAA Privacy Rule.**

### PROTECTED HEALTH INFORMATION (PHI)

All Workforce Members are required to know what information is covered under the rule and the types of information they are legally able to access and use. Commonly referred to as *individually identifiable health information* and *protected health information* or simply, **PHI,** both phrases are essentially the same and refer to health information or patient/client information that the patient/client shares with a health care entity (i.e.: Goals). This includes, but is not limited to: information regarding a patient/client's medical history, mental, or physical condition or treatment, as well as the patient/client's family member records, test results, conversations, research records and financial information.

Some information may not be considered PHI alone, but with other information it may be like pieces to a puzzle that could lead to the identification of patient/client. For example, a zip code is not normally a piece of information that can identify a patient, but together with an insurance card and a telephone number, it is possible to identify that person as a patient. If the information can reasonably be connected to the person's identity, then it is considered PHI in that instance.

**All health information that identifies an individual is considered PHI.** It does not matter if Goals is responsible for creating the information or if it receives it from another source such as a hospital, insurance company or other healthcare office. Under the HIPAA law, it is treated the same, as confidential information.

**PHI can be oral, written or electronic information.** A simple conversation between the doctor and the nurse about a patient/client and the diagnosis is considered the same as written information or electronically communicated PHI.

Examples of PHI include, but are not limited to:

> Physical medical and psychiatric records including: electronic, paper, photo, video, diagnostic and therapeutic reports, laboratory and pathology samples
>
> Patient insurance and billing records

- Computerized patient data

> Visual observation of patients receiving medical care or accessing services
>
> Verbal information provided by or about a patient
>
> Personal information such as: name, address, telephone number, e-mail and social security

## RULES FOR THE USE AND DISCLOSURE OF PHI

To **use** PHI means to access, view, examine, analyze and share information. To **disclose** PHI means to release to, transfer to and or make information available to someone who is not a Goals Workforce Member or to an Allure Workforce Member that is not authorized to receive such PHI.

Workforce Members may only use and disclose PHI for the following purposes:

1. Generally, for treatment, payment processing, and healthcare operations purposes. The law deems it appropriate for Workforce Members to access and use certain information to complete certain job responsibilities, accordingly, the patient/client does not need to provide written authorization to use and disclose such PHI.

2. If the patient/client or authorized individuals authorizes such use and disclosure in writing.

3. If the patient/client or authorized individual demands that such PHI be disclosed to the patient/client or authorized individual.

## ROUTINE AND NON-ROUTINE REQUESTS NOT RELATED TO TREATMENT

If information is directly related to the job responsibilities that each Workforce Member must do, generally it can be disclosed. If the information is not within that Workforce Member's job responsibility, then they must go to the designated person responsible for requests and disclosures at Goals and advise that individual of that request.

## GUIDELINES TO PROTECT THE PRIVACY OF HEALTH INFORMATION

1. All Workforce Members are required to keep patient records in a designated area, away from any place that is accessible to unauthorized individuals or casual viewers.

2. All Workforce Members must refrain from discussing any and all patient information in any public places, and make sure all formal and informational patient consultations are held in areas that have limited access to unauthorized individuals.

3. All Workforce Members must remember to log off computer terminals so that confidential information cannot be viewed by on lookers.

4. All Workforce Members must refrain from leaving papers around; all paperwork should be filed immediately upon creation or receipt, as appropriate.

5 . All Workforce Members should utilize designated fax or copier machines for faxing or copying patient information. If no machine is specifically designated, fax or copy information in an area that has limited or no access to unauthorized individuals.

## PRIVACY OFFICER

HIPAA requires each organization that uses PHI to appoint a Privacy Officer to facilitate the implementation of these privacy rules. The Privacy Officer may designate a person to be responsible for implementing and maintaining most of these processes and the Privacy Officer retains oversight and responsibility for the entire program. It is every Workforce Member's responsibility to know the name and contact number of the designated individuals that have been assigned responsibility for complaints and other requests related to patient privacy. The **Privacy Officer** for Goals is: **VICTORIA SMOL YAR**

## NOTICE OF PRIVACY PRACTICES

Goals has a privacy practice designated to protect the privacy and confidentiality of patient protected health information. The Federal Government requires that each organization provides each patient a "Notice of Privacy Practice". This is developed by the organization that defines policies as to how the organization may use and disclose patient personal health information. Privacy notices are distributed to patients only once and usually upon admission and upon request to any member of the public. Copies of the receipt for the Notice of Privacy Practices will be kept on file for a period of 6 years. Notice of Privacy Practice is given at the first time of the patient encounter. Parents have access to the files of their children under the age of 18.

## PATIENT PRIVACY RIGHTS

The patient also has the following rights regarding the use and disclosure of his or her protected health information without fear of retaliation. In addition, patients cannot be asked to waive their rights as a condition of treatment and payment.

1. A patient has the right to receive the Privacy Notice at the time of first service.

2. A patient has the right to request restrictions or limitations on how their protected health information is used or disclosed for treatment, payment or healthcare operations.

    Any restriction request must be forwarded to the privacy officer.

3. Health care organizations will choose a method of identifying a record containing restricted information. A notation is made in the patient's medical record indicating that restrictions to the use and/or disclosure of protected health information is in force. For example, a brightly colored sticker can be used to indicate there are restrictions contained in the medical record.

4. The patient has the right to identify alternative means of communication and alternative locations that they wish to have their protected health information communicated for the purpose of maintaining confidentiality. This alternative method is different than the usual practice that the facility would use. This can include but not be limited to sending bills to a PO BOX as opposed to a home address, sending medical information via certified, not regular mail etc.

5. The patient has the right to request access to their health information for inspection and/or copying. This request is made in writing. Additionally, the patient may request to amend or change his or her health information by requesting to do so in writing.

6. The patient has the right to request in writing, an accounting of disclosures of health care information other than treatment, payment or health care operations.

## CONSEQUENCES FOR BREAKING THE RULES

There are penalties for anyone that intentionally violates the HIPAA Privacy Rule. All Workforce Members are subject to possible penalties by the Office of Civil Rights, including civil and criminal penalties. Criminal penalties can include rather hefty monetary penalties and or jail time. Examples of criminal actions include knowingly releasing information in violation of the law or selling the information.

Furthermore, any Goals Workforce Member that intentionally violates the HIPAA Privacy Rule will be subject to immediate termination from Goals.

Goals has a zero-tolerance policy for Workforce Members that turn a blind eye to other Workforce Member's willful violations of the HIPAA Privacy Rule. Any Workforce Member that sees another Workforce Member violate these rules, whether such violation is accidental or on purpose, must report the violation to the Privacy Officer. Knowing and failing to report such willful violations will deem that Workforce Member complicit and will result in immediate termination.

## DOCUMENTATION OF WORKFORCE HIPAA PRIVACY TRAINING

HIPAA requires that Goals' Privacy Officer train all Workforce Members on Goals' health information privacy policies and procedures to the HIPAA Omnibus Standards of 2013, which also includes HI-TECH and Protected Health Information (PHI), Electronic Protected Health Information (ePHI) and Electronic Health Records (EHR).

All Workforce Members with treatment, payment or healthcare operations responsibilities, which allow access to PHI, are trained with updates periodically as State and Federal mandates require. HIPAA also requires that Goals keep this documentation (that the training was completed) for six (6) years after the training.

I, _____, HAVE READ AND UNDERSTOOD GOALS' POLICY REGARDING THE HIPAA PRIVACY RULE AND THE PRIVACY, SECURITY, USE AND RELEASE OF PHI.

I AGREE TO MAINTAIN CONFIDENTIALITY OF ALL INFORMATION OBTAINED DURING MY EMPLOYMENT/AFFILIATION WITH GOALS, INCLUDING, BUT NOT LIMITED TO PERSONAL AND SENSITIVE INFORMATION REGARDING PATIENTS.

I UNDERSTAND THAT INAPPROPRIATE USE OR RELEASE OF PATIENT INFORMATION IS GROUNDS FOR IMMEDIATE TERMINATION AND THAT ANY SUCH INAPPROPRIATE USE OR RELEASE OF PHI WILL BE REPORTED AND SUBJECT ME TO POSSIBLE PENALTIES FROM THE OFFICE OF CIVIL RIGHTS, INCLUDING CIVIL AND CRIMINAL PENALTIES, SUCH AS JAIL TIME AND FINES.

WORKFORCE MEMBER SIGNATURE                           DATE

X _____                    2/15/18

**SCHEDULE C: CONFIDENTIALITY, INTELLECTUAL PROPERTY & TRADE SECRETS AGREEMENT**

This Confidentiality, Intellectual Property & Trade Secrets Agreement (the "Confidentiality Agreement) is entered into on this <u>8th</u> day of <u>February</u> 20<u>18</u>, by and between the Practice and the Physician (as defined in the Independent Contractor Agreement (the "Agreement") to which this Confidentiality Agreement is attached. This is totally irrelevant to Physician as he will serve only as a technician in providing surgical procedures to patients as outlined in fee schedule for amounts paid.   He will not be part of any intellectual property and trade secrets agreement, This schedule C Is null and void.   Physician serving as technician will not be exposed in any way whatsoever to such information." Commonly referred to as *individually identifiable health information* and *protected health information* or simply, **PHI**, both phrases are essentially the same and refer to
health information or patient/client information that the patient/client shares with a health care entity (i.e.: Goals)." Is fully protected as required properly in schedule B, and is not relevant to non-patient related confidential matters, intellectual property, and trande secret agreements.

1. **PURPOSE.** The Parties (as defined in the Agreement) wish to set forth the terms and conditions under which information created or received by or on behalf of the Practice, including Confidential Information (as defined below) and Protected Health Information ("PHI") (as defined in "Schedule B" to the Agreement and incorporated herein by reference, when applicable,) may be used or disclosed by the Physician under this Confidentiality Agreement, state law and the Health Insurance Portability and Accountability Act of 1996 and the HIPAA Omnibus Rule of 2013 (collectively, "HIPAA").

2. **CONSIDERATION.** In consideration of the Physician's execution of this Confidentiality Agreement, the Physician will be entitled to the compensation and other benefits conferred onto the Physician by the Agreement, to which this Confidentiality Agreement is attached as "Schedule C", and which is incorporated herein by reference. No separate monetary consideration shall be provided to the Physician with respect to this Confidentiality Agreement as the consideration set forth in the Agreement shall be deemed as good, valid, and sufficient consideration for this Confidentiality Agreement as well.

3. **CONFIDENTIAL INFORMATION.** The Parties acknowledge that to enable the Physician to provide the agreed upon services to the Practice (as set forth in the Agreement), the Practice mayor will not be required to disclose Confidential Information to the Physician and the Physician will be required to use the same in the execution of his duties (as set forth in the Agreement, and subject to the limitations therein).

   A. Definition of" Confidential Information" . For purposes of this Confidentiality Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business in which the Practice is primarily engaged including, but not limited to, any trade secrets as defined below, or any intellectual property of the Practice. If Confidential Information is in written form, other than PHI (which Is already protected via schedule B), the Practice shall label or denote the materials with the word "Confidential"
   or some similar warning. If Confidential Information is transmitted orally, except PHI, the Practice shall promptly provide a writing indicating that such oral communication constituted Confidential Information if necessary. and is not needed by physician nor ever requested by physician, unless it impacts on provision of proper surgery.

   In addition, Confidential Information shall also include the following non-exhaustive list: any information

   protected by HIPAA or needed for providing technical service is all that should be exposed to Physician.

   - PHI (as this term is defined in <u>Schedule B</u> of the Agreement) was covered;

   - Any information about patients of the Practice or employees of the Practice, including, but not limited to, employee names, addresses, telephone numbers, e-mails, social media accounts, spouse or children information, and/or social security information or numbers;should not be disclosed if not relevant to patient's surgery procedure.

Any intellectual property rights of the Practice as defined and discussed below;

Any proprietary information or trade secrets of the Practice as set forth and discussed hereinbelow;

- Any information that concerns the Practice's contractual relationships, relates to the Practice's competitive advantages, or is otherwise designated as confidential by this Practice as set forth and discussed herein below;

- Any information obtained from the Practice's records which if disclosed, would constitute an unwarranted invasion of privacy; and

- Any confidential business information that would cause harm to the Practice if disclosed.

B. **Exclusions from Confidential Information.** Physician's obligations under this Confidentiality Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Physician; (b) discovered or created by Physician before disclosure by the Practice; (c) learned by the Physician through legitimate means other than from the Practice or the Practice's representatives; or (d) is disclosed by the Physican with the Practice's prior written approval of such information provided to the Physican from the Practice and specifically denoted as to be forwarded or disclosed to potential third-parties to which the Practice has granted to the Physician in writing.

C. **Obligations of the Physician.** The Physician shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Practice. Physician shall carefully restrict access to Confidential Information to employees, contractors, and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Confidentiality Agreement if necessary. Physician shall not, without prior written approval of the Practice, use for Physician's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of the Practice, any Confidential Information. The Physician shall return to the Practice any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if the Practice requests it in writing and/or consistent with the terms herein.

D. **Time Period for Maintenance of Confidence.** The nondisclosure provisions herein shall survive after the termination of this Agreement and Physician's duty to maintain and hold such Confidential Information in confidence shall remain in effect until the Practice ceases operations, or until the Practice sends Physician written notice releasing Physician from this Confidentiality Agreement, but at no time more than thirty days after termination of the Agreement, except as applies to HIPPA..

E. **Allowed Disclosure.** Notwithstanding the foregoing, nothing in this Agreement shall be construed to bar the disclosure of any such confidential information:

  i. Upon the written consent of all Parties;

  ii. In response to an order of a court of competent jurisdiction following reasonable notice (not fewer than 2 business days) to the Parties in accordance with the notice provisions set forth in the Agreement;

  iii. In response to any inquiry or order issued by a state or federal agency of competent jurisdiction provided that the receiving Party gives reasonable notice (not fewer than 2 business days) to the other Party in accordance with the notice provisions set forth in the Agreement;

    v.    To the extent necessary, to appropriate taxing authorities;

    v.    To any Party's accountants, attorneys, financial advisors, and/or tax advisors and then only upon the agreement of the above-referenced third-parties to maintain the confidentiality of the Confidential Information; or

    vi.    In connection with the enforcement of this Agreement.

For purposes of this section, the term "an order of a court of competent jurisdiction" shall not mean a deposition notice or demands for discovery or a subpoena.

4. **TRADE SECRETS.** By way of entering into this Agreement, Physician may receive or otherwise become privy to unique, specialized, and/or Confidential Information concerning the Practice's business operations, including, but not limited to, operating techniques and procedures, marketing techniques and procedures, financial data, processes, vendors and other information that was developed and maintained at considerable effort and expense to the Practice, for the Practice's sole and exclusive use, and which if used by the Practice's competitors, would give those competitors an unfair business advantage.

Physician understands and agrees that it shall not provide any other business, medical practice, entity, person or other with any of Practice's trade secrets as described herein without prior written authorization from the Practice.

5. **INTELLECTUAL PROPERTY -INVENTIONS, IDEAS, PROCESSES, AND DESIGNS.** Each Party advises that it comes, or may come, to the Agreement with its own inventions, ideas, processes and designs (including improvements), and that any such invention, idea, process and design (including improvements) are, and shall remain the sole and exclusive property of the Party which brings such invention, idea, process and design (including improvements).

All inventions, ideas, processes, and designs (including all improvements): (i) conceived or made by Physician or any agent of Physician during the Term of the Agreement (whether or not actually conceived during regular business hours); and (ii) related to the business of the Practice, shall be disclosed in writing promptly to the Practice and ownership shall be equally shared between the Physician and Practice subject to the limitations set forth below.

An invention, idea, process or design (including an improvement) shall be deemed "related to the business of the Practice" if: (a) it was made with equipment, supplies, facilities, or confidential information of the Practice; (b) results from work performed by Physician pursuant to the terms of the Agreement; or (c) pertains to the current business or demonstrably anticipated research or development work of the Practice.

Notwithstanding anything to the contrary, if Physician, during the Term of Agreement, and related to the services provided to the Practice as set forth in the Agreement, suggests, assists, works on, or otherwise modifies any process or any existing intellectual property of the Practice to which the Practice has a trademark, patent or copyright, either statutorily or under common law; any suggestions, changes, edits, modification, amendments, designs, versions or updates to such trademarked, patented or copyrighted intellectual property of the Practice shall remain the sole and exclusive property of the Practice and Physician shall, upon the request of the Practice, provide in writing a waiver of any potential rights thereto.

The Physician and any agent of Physician shall cooperate with the Practice, or any such individual or entity as Practice assigns said intellectual property, and their attorneys, in the preparation of patent, trademark and copyright applications for such developments and, upon request, shall promptly assign all such inventions, ideas, processes, and designs to the Practice as set forth in this section. The decision to file for patent,

trademark or copyright protection, or to maintain such development as a trade secret shall be in the sole and exclusive discretion of the Practice and Physician shall be bound by such decision.

6. **INTELLECTUAL PROPERTY - PHOTOGRAPHS AND VIDEOS.** Notwithstanding anything to the contrary, all photographs and videos documenting surgical or aesthetic procedures done by the Physician on behalf of the Practice, taken by the Practice or the Physician himself, shall remain the intellectual property of the Practice and are subject to all the applicable provisions of this Confidentiality Agreement, including, but not limited to, all the Types of Disclosure, Non-Disclosure, Indirect Disclosure, Direct Disclosure, Injunctive Relief, and Violations, as set forth below. These photographs and videos include, but are not limited to, all photographs and videos of:

Patient "before and afters" (i.e.: photos and videos of patients before their procedures and after their procedures);

- Patient surgical or cosmetic procedures;
- Patient surgical or cosmetic consultations; and/or

Interviews or Q&A sessions with Physician.

7. **TYPES OF DISCLOSURE AND USE.** Physician understands and agrees that the disclosure and use of Confidential Information includes oral communications as well as display, reproduction or distribution of tangible physical documentation, in whole or in part, from any source or in any format (e.g., paper, digital, electronic, internet, social network postings on platforms such as Facebook, Twitter, Instagram, Snapchat, etc., magnetic or optical media, film, etc.).

8. **OWNERSHIP OF CONFIDENTIAL INFORMATION.** Physician understands and agrees that the Practice, not the Physician, is the owner under state and/or federal law and the Physician has no right or ownership interest in any Confidential Information.

9. **NON-DISCLOSURE.** Physician understands and agrees that Confidential Information will not be used or disclosed by the Physician in violation of this Agreement; applicable law, including, but not limited, to HIPAA; Federal and State records owner statute; the Practice's Notice of Privacy Practices, as amended from time to time; or other limitations as put in place by Practice from time to time.

The intent of this Agreement is to ensure that the Physician will use and access only the minimum amount of Confidential Information necessary to perform the services by Physician's as set forth and pursuant to the Agreement and will not disclose Confidential Information outside this Practice unless expressly authorized in writing to do so by this Practice.

All Confidential Information received (or which may be received in the future) by Physician will be held and treated by him or her as confidential and will not be disclosed in any manner whatsoever, in whole or in part, except as authorized by this Practice and will not be used other than in connection with the employment relationship.

10. **UNATTENDED CONFIDENTIAL INFORMATION.** The Physician understands and agrees that he or she will not leave Confidential Information unattended (e.g., so that it remains visible).

11. **COMPUTER, E-MAIL, PROGRAM, DATABASE OR WEBSITE LOG-ON INFORMATION AND PASSWORDS.** The Physician agrees that his or her knowledge of any Practice computer, e-mail, program, database or website log-on information or password will not be disclosed to or used by anyone other than the Physician. If the Physician is not privy to any Practice computer, e-mail, program, database or website

log-on information or password the Physician will not attempt to learn any such Practice Computer e-mail, program, database or website log-on information or passwords.

The Physician immediately will notify this Practice's HIPAA Privacy Officer upon suspecting that any violation of this paragraph occurs.

12. **Computer Systems.** The Physician agrees that all computer systems are the exclusive property of Practice and will not be used by the Physician for any purpose unrelated to the services as set forth in the Agreement.

13. **NO RIGHT TO PRIVACY.** The Physician acknowledges that he or she has no right of privacy when using this Practice's computer systems and that his or her computer use may and shall be periodically monitored by this Practice to ensure compliance with the Agreement, this Confidentiality Agreement, and applicable law.

14. **RETURN OF CONFIDENTIAL INFORMATION.** Immediately upon request by this Practice, the Physician will return all Confidential Information to this Practice and will not retain any copies of any Confidential Information, except as otherwise expressly permitted in writing signed by this Practice.

All Confidential Information, including copies thereof, will remain and be the exclusive property of this Practice, unless otherwise required by applicable law.

To the extent that the Practice provides Physician, or any agent or employee thereof, with any products, product specifications, materials, selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer/patient correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer and vendor lists, prospectus reports, customer or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, any and all such products, product specifications, materials, selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer and vendor lists, prospectus reports, customer or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, including all copies, duplications, replications, and derivatives of such information or products, now in the possession of Physician or acquired by Physician while providing the services as set forth in the Agreement, shall be the exclusive property of the Practice and shall be returned to the Practice no later than the date of termination as set forth in the Agreement or at the expiration of any Term as set forth in the Agreement.

15. **INDIRECT DISCLOSURE.** The Physician specifically agrees that he or she will not allow anyone working on their behalf, or affiliated with the Physician in any way to use, copy, disclose or disseminate any or all Confidential Information for any purpose.

16. **DIRECT VIOLATIONS.** The Physician understands that violating the terms of this Agreement may, in this Practice's sole discretion, result in disciplinary action including termination of employment and/or legal action to prevent or recover damages for breach.

17. **FAILURE TO REPORT VIOLATIONS.** The Physician understands that the Practice has a "zero-tolerance policy" for individuals that do not immediately advise the Practice of other individual's (whether an employee of the Practice or otherwise) willful misuse, reproduction and/or distribution of any of the Practice's Confidential Information. Physician agrees that if he or she sees another individual, employee or otherwise,

misuse, reproduce or distribute any such Confidential Information, the Physician will immediately report any such misuse, reproduction or distribution to the Practice. Knowing of such violation, and failing to report such misuse, reproduction or distribution, will be deemed by the Practice as complicity by the Physician and will result in immediate termination pursuant to the terms of the Agreement and the Practice may, its sole discretion, institute appropriate legal action against the Physician.

18. **INJUNCTIVE RELIEF.** The parties agree that any breach of this Confidentiality Agreement by the Physician will result in irreparable injury to the Practice for which money damages are inadequate; therefore, in the event of a breach or an anticipatory breach, the Practice will be entitled (in addition to any other rights and remedies which it may have at law or in equity, including money damages) to have an injunction without bond issued enjoining and restraining the Physician and/or any other person involved from breaching this Agreement.

The Practice will be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief. Further, in the event of any litigation relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and expenses.

19. **VIOLATION OF THE AGREEMENT.**

A. **Specific Performance, Right to Injunctive Relief.** Physician does not agree that a breach of any of the covenants contained in this Confidentiality Agreement will cause irreparable injury to the Practice for which the remedy at law may be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, the Practice shall not be entitled, in addition to any other rights and remedies they may have at law or in equity, to obtain an injunction to restrain Physician from any threatened or actual activities in violation of any such covenants.

The Physician hereby consents and agrees that temporary and permanent injunctive relief may be requested in any proceedings that might be brought to enforce any such covenants with the necessity of proof of actual damages, and in the event Practice does apply for such an injunction, the Physician shall not raise as a defense thereto that the Practice has an adequate remedy at law.

B. **Liquidated Damages.** In addition to the rights set forth above, Physician agrees that a breach of any of the covenants contained in this Confidentiality Agreement will not cause irreparable injury to the Practice for which the remedy at law may be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, the Practice shall not be entitled to liquidated damages as follows:

    i.   $100,000.00 for any intellectual property set forth in above which is misappropriated with respect to the diminished reputation or value of Compliant in the community with respect to the misappropriated intellectual property; and

    ii. $100,000.00 for any other trade secret misappropriated.

Physician agrees that these amounts are not reasonable in consideration of the harm which will befall the Practice for any misappropriation consistent with the agreement that actual damages may be impossible to otherwise quantify.

Nothing herein shall bar the Practice from seeking any other remedies available at law.

C. **Compensatory and Anticipatory Damages.** Should a trade secret or other intellectual property be misappropriated by the Physician, including, but not limited to, the use or sale of such intellectual property to a third-party, competing business, or should the Physician use any intellectual property as set forth in

this Agreement for their own personal gain, Physician hereby does not agree that it shall, upon demand, cease such misappropriation and, within 30 days, forward all funds derived from such misappropriation to the Practice along with certified financial statements showing the value or remuneration obtained from such misappropriation. Should the Practice be forced to initiate legal action, Physician does not agree that, in addition to any other remedy available to the Practice, including those remedies set forth in this Confidentiality Agreement, damages shall include the total amount of value, monetarily, obtained by the Physician or anticipated to be obtained by Physician as a result of such misappropriation.

D. **Attorney's Fees and Costs.** The Parties agree that, should the Parties   be forced to initiate any actions for breach of this Confidentiality Agreement, or any covenants thereof, or as a matter of law; the Parties shall, if successfully, be entitled to an award of its reasonable attorney's fees and costs associated with such action. Nothing herein shall permit the award of any award of counsel fees or costs to the Parties in the event of a violation of the terms of this Confidentiality agreement or if the Party is unsuccessful in such proceeding unless required by law.

20. **INTEGRATION.** This Confidentiality Agreement and the Agreement to which this Agreement is attached, which is hereby incorporated by reference, constitutes the entire understanding between the parties with respect to the subject matter herein, and supersedes any and all prior or contemporaneous understandings and agreements, whether oral or written, between the Parties. Specifically, each and every term in Section 18 of the Agreement (Miscellaneous Terms) are deemed repeated herein and incorporated by reference as though each term was written here in full.


**I, ,UNDERSTAND THAT** BY VIRTUE **OF MY RETENTION BY THE PRACTICE PURSUANT TO THE AGREEMENT, I HAVE ACCESS TO CONFIDENTIAL INFORMATION THAT IF IMPROPERLY DISCLOSED, COPIED, OR DISSEMINATED WILL CAUSE IRREPARABLE HARM TO THE PRACTICE, ITS GENERAL BUSINESS, OWNERS, EMPLOYEES, AND/OR ITS PATIENTS/CLIENTS.**

**I HAVE READ AND UNDERSTOOD** THE PRACTICE'S **CONFIDENTIALITY AGREEMENT AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT WITH AN ATTORNEY OF MY OWN CHOOSING.**

**I UNDERSTAND THAT IT IS MY LEGAL OBLIGATION TO MAINTAIN CONFIDENTIAL ALL CONFIDENTIAL INFORMATION OBTAINED IN THE COURSE OF MY ASSOCIATION OR AFFILIATION WITH THE PRACTICE.**

**I UNDERSTAND THAT INAPPROPRIATE USE OR RELEASE OF CONFIDENTIAL INFORMATION IS GROUNDS FOR IMMEDIATE TERMINATION AND THAT ANY SUCH INAPPRORIATE USE OR RELEASE OF** CONFIDENTIAL INFORMATION **WILL SUBJECT ME TO POSSIBLE CIVIL AND CRIMINAL PENALTIES.**


**PHYSICIAN SIGNATURE**                                  DATE

X _____                   9/15/18

NYC Medical Practice, P.C. - Independent Contractor Agreement (Dr. Pober)

SCHEDULE 0 NON-SOLICITATION AGREEMENT

This Non-Solicitation Agreement is entered into on this 8th day of February 20.1§., by and between the Practice and the Physician (as defined in the Independent Contractor Agreement (the "Agreement") to which this Non-Solicitation Agreement is attached.

1. PURPOSE. The Practice and the Physician wish to set forth the terms and conditions under which the Physician may solicit the Practice's Patients/Clients, Prospective Patients/Clients and Workforce Members (as defined below).

2. CONSIDERATION. In consideration of the Physician's execution of this Non-Solicitation Agreement, the Physician will be entitled to the compensation and other benefits conferred onto the Physician by the Agreement to which this Non-Solicitation Agreement is attached as "Schedule 0", and which is incorporated by reference. No separate monetary consideration shall be provided to the Physician with respect to this Non-Solicitation Agreement as the consideration set forth in the Agreement shall be deemed as good, valid, and sufficient consideration for this Non-Solicitation Agreement as well.

3. DEFINED TERMS.

    A. "Competitive Business" refers to any medical office, doctor or practitioner, partnership, joint venture, corporation and/or any other entity and/or person and/or any licensee of such entity, that provides plastic surgery procedures, medical spa treatments, injectibles, and any other procedure or treatment that the Practice provides or has the ability to provide.

    B. "Patient/Client" refers to any person that has been subject to any medical or medical spa procedure or treatment from the Practice.

    C. "Prospective Patient/Client" refers to any person that is reasonably expected to subject themselves to any medical or medical spa procedure or treatment from the Practice.

    D. "Workforce Member" refers to any of the Practice's administrative and professional employees, medical staff and other health care professionals, whether employees or independent contractors; volunteers; agency, temporary and registry personnel; house staff, students, and interns.

4. SOLICITATION. For the purpose of this Non-Solicitation Agreement, solicitation is limited to an actual effort made to convince, coerce, or direct an individual to obtain services which are competitive with the Practice.

    General advertisements and mailings to certain zip codes where Patient/Clients and Prospective Patient/Clients could reside, and other general marketing activities are not considered solicitation.

    Nothing in this Non-Solicitation Agreement shall prohibit the Physician from treating a Patient/Client or Prospective Patient/Client who wishes to be treated by the Physician after the Physician's affiliation with the Practice has terminated.

5. NON-SOLICITATION OF PATIENTS/CLIENTS AND PROSPECTIVE PATIENTS/CLIENTS.

    A. The Physician covenants and agrees that during the term of the Physician's association with the Practice and for two (2) years after any termination of such association, the Physician will not, directly or indirectly, solicit or attempt to solicit any business from any of the Practice's Patients/Clients or Prospective Patients/Clients on behalf of themselves or any Competitive Business.

    B. The non-solicitation restriction set forth in paragraph 4(a) is specifically limited to Patients/Clients and Prospective Patients/Clients of the Employer:

   i.    With whom Physician had contact with, whether personal or telephonic or electronic correspondence, during the three (3) year period immediately preceding the Physician's termination; or

   j.    About whom Physician had Protected Health Information ("PHI"), (as such is defined by Schedule B of the Agreement), because of his or her position with the Practice.

6. **NON-SOLICITATION OF THE** PRACTICE'S **WORKFORCE MEMBERS.** The Physician covenants and agrees that during the term of the Physician's association with the Practice and for two (2) years after the termination of association, the Physician will not, directly or indirectly, on his or her behalf or on behalf of or in conjunction with any person or entity, recruit, solicit, or induce, or attempt to recruit, solicit, or induce, any of the Practice's Workforce Members with whom Physician had personal contact or supervised throughout Physician's association, to terminate their association relationship with the Practice.

7. **INJUNCTIVE RELIEF.** The parties agree that any breach of this Non-Solicitation Agreement by the Physician will result in irreparable injury to the Practice for which money damages are inadequate; therefore, in the event of a breach or an anticipatory breach, the Practice will be entitled (in addition to any other rights and remedies which it may have at law or in equity, including money damages) to have an injunction without bond issued enjoining and restraining the Physician and/or any other person involved from breaching this Non-Solicitation Agreement.

The Practice will be entitled to recover its costs and fees, excluding reasonable attorneys' fees, incurred in obtaining any such relief. Further, in the event of any litigation relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and expenses.

8. **INTEGRATION.** This Non-Solicitation Agreement and the Independent Contractor Agreement to which this Agreement is attached, which is hereby incorporated by reference, constitutes the entire understanding between the parties and supersedes any and all prior or contemporaneous understandings and agreements, whether oral or written, between the parties.

9. **SEVERABILITY.** Although the restrictions contained in this Non-Solicitation Agreement are considered by the parties to be reasonable for the purpose of protecting the business and good will of the Practice, if any such restriction is found by a court of competent jurisdiction to be unenforceable, such provision will be modified, rewritten or interpreted to include as much of its nature and scope as will render it enforceable. If it cannot be so modified, rewritten or interpreted to be enforceable in any respect, it will not be given effect, and the remainder of the Non-Solicitation Agreement will be enforced as if such provision was not included.

10. **WAIVER.** Any failure by the Practice to enforce the Physician's strict performance of any provision of this Non-Solicitation Agreement will not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Non-Solicitation Agreement.

11. **NO ASSIGNMENTS.** This Non-Solicitation Agreement is personal in nature, and the Physician may not directly or indirectly assign or transfer it by operation of law.

12. **INTERPRETATION.** The headings in this Non-Solicitation Agreement are for organizational purposes only and should not be used in the interpretation or construction of this Non-Solicitation Agreement. The language in all parts of this Non-Solicitation Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either party. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Non-Solicitation Agreement.

13. **JURISDICTION AND VENUE.** The parties agree that the interpretation, legal effect and enforcement of this Agreement shall be governed by the laws of the State of New York and each party agrees to the jurisdiction of the courts of New York. The parties agree that any suit arising out of or relating to this Non-Solicitation Agreement shall be brought in Kings County, New York.

**I HAVE READ AND UNDERSTOOD** THE PRACTICE'S **NON-SOLICITATION AGREEMENT AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT WITH AN ATTORNEY OF MY OWN CHOOSING.**

**I UNDERSTAND AND AGREE THAT THE TERMS OF THIS NON-SOLICITATION AGREEMENT ARE REASONABLE AND NECESSARY TO PROTECT THE PRACTICE, ITS GENERAL BUSINESS, OWNERS, EMPLOYEES, AND/OR ITS PATIENTS/CLIENTS.**

**I UNDERSTAND THAT MY VIOLATION OF THIS AGREEMENT WILL RESULT IN IRREPARABLE HARM TO THE PRACTICE, ITS GENERAL BUSINESS, OWNERS, EMPLOYEES, ANDIOR ITS PATIENTS/CLIENTS AND CAN SUBJECT ME TO LITIGATION.**

PHYSICIAN SIGNATURE                                                 DATE

X _____                     8/15/18

E

X

H

I

B

I

T

B

# EXHIBIT B

These charges are only allegations which

may be contested by the licensee in an

Administrative hearing.

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER** **OF** **JOSEPH MICHAEL POBER, M.D.** | NOTICE OF HEARING |

TO:   JOSEPH MICHAEL POBER, M.D.

███████████████████████

PLEASE TAKE NOTICE:

A hearing will be held pursuant to the provisions of N.Y. Pub. Health Law §230 and N.Y. State Admin. Proc. Act §§301-307 and 401. The hearing will be conducted before a committee on professional conduct of the State Board for Professional Medical Conduct on June 15, 2018 at 10:00 a.m., at the Offices of the New York State Department of Health, 90 Church Street, New York, New York 10007 and at such other adjourned dates, times and places as the committee may direct.

At the hearing, evidence will be received concerning the allegations set forth in the Statement of Charges, which is attached. A stenographic record of the hearing will be made and the witnesses at the hearing will be sworn and examined. You shall appear in person at the hearing and may be represented by counsel who shall be an attorney admitted to practice in New York state. You have the right to produce witnesses and evidence on your behalf, to issue or have subpoenas issued on your behalf in order to require the production of witnesses and documents, and you may cross-examine witnesses

and examine evidence produced against you. A summary of the Department of Health
Hearing Rules is enclosed.

YOU ARE HEREBY ADVISED THAT THE ATTACHED CHARGES WILL BE MADE
PUBLIC FIVE BUSINESS DAYS AFTER THEY ARE SERVED.
Department attorney: Initial here▮▮▮▮▮▮

    The hearing will proceed whether or not you appear at the hearing. Please note that
requests for adjournments must be made in writing and by telephone to the New York State
Department of Health, Division of Legal Affairs, Bureau of Adjudication, Riverview
Center,150 Broadway - Suite 510, Albany, NY 12204-2719, ATTENTION: HON. JAMES
HORAN, DIRECTOR, BUREAU OF ADJUDICATION, (henceforth "Bureau of
Adjudication"), (Telephone: (518-402-0748), upon notice to the attorney for the Department
of Health whose name appears below, and at least five days prior to the scheduled hearing
date. Adjournment requests are not routinely granted as scheduled dates are considered
dates certain. Claims of court engagement will require detailed Affidavits of Actual
Engagement. Claims of illness will require medical documentation.

    Pursuant to the provisions of N.Y. Pub. Health Law §230(10)(c), you shall file a
written answer to each of the charges and allegations in the Statement of Charges not less
than ten days prior to the date of the hearing. Any charge or allegation not so answered
shall be deemed admitted. You may wish to seek the advice of counsel prior to filing such
answer. The answer shall be filed with the Bureau of Adjudication, at the address indicated
above, and a copy shall be forwarded to the attorney for the Department of Health whose
name appears below. Pursuant to §301(5) of the State Administrative Procedure Act, the

Department, upon reasonable notice, will provide at no charge a qualified interpreter of the deaf to interpret the proceedings to, and the testimony of, any deaf person. Pursuant to the terms of N.Y. State Admin. Proc. Act §401 and 10 N.Y.C.R.R. §51.8(b), the Petitioner hereby demands disclosure of the evidence that the Respondent intends to introduce at the hearing, including the names of witnesses, a list of and copies of documentary evidence and a description of physical or other evidence which cannot be photocopied.

At the conclusion of the hearing, the committee shall make findings of fact, conclusions concerning the charges sustained or dismissed, and in the event any of the charges are sustained, a determination of the penalty to be imposed or appropriate action to be taken. Such determination may be reviewed by the Administrative Review Board for Professional Medical Conduct.

> THESE PROCEEDINGS MAY RESULT IN A DETERMINATION
> THAT YOUR LICENSE TO PRACTICE MEDICINE IN NEW
> YORK STATE BE REVOKED OR SUSPENDED, AND/OR
> THAT YOU BE FINED OR SUBJECT TO OTHER SANCTIONS
> SET OUT IN NEW YORK PUBLIC HEALTH LAW §§230-a.
> YOU ARE URGED TO OBTAIN AN ATTORNEY TO
> REPRESENT YOU IN THIS MATTER.

DATED: April 27, 2018
New York, New York

HENRY WEINTRAUB
Counsel
Bureau of Professional Medical Conduct

Inquiries should be directed to:
Associate Counsel
Bureau of Professional Medical Conduct
90 Church Street, 4th Floor
New York, NY 10007
Tel. No. 212-417-4450

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| IN THE MATTER | STATEMENT |
| OF | OF |
| JOSEPH MICHAEL POBER, M.D. | CHARGES |

JOSEPH MICHAEL POBER, M.D., the Respondent, was authorized to practice medicine in New York State on or about November 7, 1980 by the issuance of license number 144489 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.   On or about and between April 2008 and January 2011 the Respondent, a plastic surgeon, performed multiple procedures on Patient A, including but not limited to excisional biopsies on Patient A's head, neck, torso and extremities.  Patient A, a 25-year-old male at the onset of treatment, and the other patients in the Statement of Charges are identified in the attached Appendix.

1.   On or about the dates below, Respondent knowingly and falsely represented on insurance claims that he utilized skin pedicle flaps for wound closure of excisional biopsies.  Respondent intended to deceive.

a.   January 23, 2009.

b.   February 20, 2009.

c.   June 16, 2009.

d.   June 16, 2009.

e.   July 23, 2009.

f.   October 2, 2009.

g.   November 20, 2009.

1

  h. November 20, 2009.

  i. December 21, 2009.

  j. December 28, 2009.

  k. January 11, 2010.

  l. February 2, 2010.

  m. February 15, 2010.

  n. March 15, 2010.

  o. March 29, 2010.

  p. April 12, 2010.

  q. April 26, 2010.

  r. June 8, 2010.

  s. July 20, 2010.

  t. July 26, 2010.

  u. November 8, 2010.

  v. November 15, 2010.

  w. December 8, 2010.

  x. December 15, 2010.

  y. January 3, 2011.

2. Alternatively, Respondent deviated from medically accepted standards, if, in fact, he utilized skin pedicle flaps for wound closure of excisional biopsies.

3. On or about February 16, 2011, Respondent inappropriately advised Patient A that he faced significant risk of melanoma for which he recommended a series of further excisional biopsies.

  a. By so doing, Respondent exercised undue influence on a patient in such a manner as to exploit Patient A or a third party for financial gain.

4. Respondent inappropriately prescribed Percocet and Vicodin on or about and between May 18, 2010 and January 19, 2011.

B. On or about and between July 3, 2012 and September 6, 2016, Respondent performed multiple procedures on Patient B, a 48-year-old female at the onset of

treatment, including but not limited to excisional biopsies on Patient B's head, neck, torso and extremities.

1. On or about the dates below, Respondent knowingly and falsely represented on insurance claims that he utilized skin pedicle flaps for wound closure of excisional biopsies.  Respondent intended to deceive.

   a.  July 3, 2012.
   b.  July 24, 2012.
   c.  July 25, 2012.
   d.  August 1, 2012.
   e.  August 28, 2012 (two claims).
   f.  August 29, 2012.
   g.  September 5, 2012.
   h.  September 12, 2012
   i.  September 25, 2012 (three claims).
   j.  September 26, 2012.
   k.  October 9, 2012.
   l.  December 31, 2012 (two claims).
   m.  February 6, 2013.
   n.  February 12, 2013
   o.  February 22, 2013.
   p.  February 27, 2013.
   q.  March 5, 2013. (two claims).
   r.  March 13, 2013.
   s.  March 16, 2013. (three claims)
   t.  March 17, 2013.
   u.  March 20, 2013.
   v.  March 21, 2013.
   w.  March 22, 2013.
   x.  March 27, 2013.
   y.  April 1, 2013.

3

z.  April 2, 2013.

aa. April 9, 2013 (two claims)

bb. April 17, 2013 (two claims).

cc.  April 24, 2013 (two claims).

dd. May 1, 2013.

ee. May 8, 2013.

ff.  May 28, 2013 (five claims).

gg. June 13, 2013 (two claims).

hh. June 18, 2013.

ii.  June 26, 2013 (two claims).

jj.  July 3, 2013.

kk. July 23, 2013.

ll.  July 24, 2013.

 mm.  August 13, 2013.

nn. August 20, 2013.

oo. September 3, 2013 (two claims).

pp. September 23, 2013.

qq. September 24, 2013

rr.  November 26, 2013 (three claims).

 i.  December 30, 2013 (two claims).

ss. January 20, 2014.

tt.  January 15, 2014 (two claims).

uu. January 20, 2014

vv. September 2, 2014.

2.  Alternatively, Respondent deviated from medically accepted standards, if, in fact, he utilized skin pedicle flaps for wound closure of excisional biopsies.

3.  Respondent ordered excessive treatment not warranted by the condition of Patient B, with respect to multiple excisional biopsies performed on or about and between July 3, 2012 and through December 2016.

4

4.   Respondent re-excised scars from excisional biopsies within an unacceptably short period of time between the initial excision and the re-excision.

C.   In or about and between March 2014 and January 30, 2015, the Respondent performed plastic surgery procedures on Patient C, a 47- year-old female, including multiple excisional biopsies.

1.   On or about the dates below, Respondent knowingly and falsely represented on insurance claims that he utilized skin pedicle flaps for wound closure of excisional biopsies.  Respondent intended to deceive.

   a.   April 21, 2014. (three claims).

   b.   April 22, 2014.

   c.   April 29, 2014 (three claims).

   d.   September 24, 2014.

   e.   September 30, 2014 (two claims)

   f.   October 6, 2014. (five claims).

   g.   January 1, 2015

   h.   January 26, 2015 (three claims).

   i.   January 30, 2015 (three claims).

2.   Alternatively, Respondent deviated from medically accepted standards, if, in fact, he utilized skin pedicle flaps for wound closure of excisional biopsies.

3.   Respondent failed to make available to the Department of Health upon written request a complete copy of Respondent's medical record for Patient C from May 2014 to the end of treatment. The Office of Professional Medical Conduct requested the medical record in a letter dated March 10, 2017.

4.   In a letter dated July 7, 2017, Respondent's attorney represented that Dr. Pober had not treated Patient C from May 2014 to the present "…so there are no updated medical or billing records …"  Respondent knowingly and falsely represented, through his agent/attorney, that he had not treated Patient C after May 2014, when, in fact, Respondent performed and billed for multiple procedures through January 2015. Respondent intended to deceive.

5

5. Alternatively, Respondent knowingly and falsely represented on Group Health Incorporated ("GHI") insurance claims that he performed multiple procedures, including wound closures with skin pedicle flaps, when, in fact, he had not performed the procedures.  Respondent intended to deceive.

D. On or about and between April 16, 2014, and August 26, 2014, the Respondent performed a variety of plastic surgery procedures on Patient D, a 46-year-old male, including multiple excisional biopsies.

1. On or about the dates below, Respondent knowingly and falsely represented on insurance claims that he utilized skin pedicle flaps for wound closure of excisional biopsies.  Respondent intended to deceive.

   a. June 4, 2014 (two claims).

   b. July 17, 2014

   c. August 25, 2014.

   d. August 26, 2014 (two claims).

2. Alternatively, Respondent deviated from medically accepted standards, if, in fact, he utilized skin pedicle flaps for wound closure of excisional biopsies.

3. Respondent failed to make available to the Department of Health upon written request a complete copy of Respondent's medical record for Patient D from May 2014 to the end of treatment. The Office of Professional Medical Conduct requested the medical record in a letter dated March 10, 2017.

4. In a letter dated July 7, 2017, Respondent's attorney represented that Dr. Pober had not treated Patient D from May 2014 to the present "…so there are no updated medical or billing records …"  Respondent knowingly and falsely represented, through his agent/attorney, that he had not treated Patient D after May 2014, when, in fact, Respondent performed and billed for multiple procedures through August 26, 2014. Respondent intended to deceive.

5. Alternatively, Respondent knowingly and falsely represented on Group Health Incorporated ("GHI") insurance claims that he performed multiple procedures, including wound closures with skin pedicle flaps, when, in fact, he had not performed the procedures.  Respondent intended to deceive.

6

E.   Respondent concealed, with intent to deceive, that he was the subject of a professional misconduct investigation on multiple applications for the reappointment to the medical staff of Saint Luke's Roosevelt Medical Center that he signed on the dates below:

1.   September 15, 2012.

2.   August 8, 2013.

3.   September 22, 2015.

7

## SPECIFICATION OF CHARGES
## FIRST THROUGH ELEVENTH SPECIFICATIONS

### FRAUDULENT PRACTICE

Respondent is charged with committing professional misconduct as defined by N.Y. Educ. Law § 6530(2) by practicing the profession of medicine fraudulently as alleged in the facts of the following:

1. A, A1 and/or A1(a) through A1(y).

2. B, B1 and/or B1(a) through B1(vv).

3. C, C1 and/or C1(a) through C1(i).

4. C3.

5. C4.

6. D, D1 and/or D1(a) through D1(e).

7. D3.

8. D4.

9. E and E1.

10. E and E2.

11. E and E3.

8

## TWELFTH THROUGH TWENTY-SECOND SPECIFICATIONS

### FALSE REPORT

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6530(21) by willfully making or filing a false report, or failing to file a report required by law or by the department of health or the education department, as alleged in the facts of:

12.   A, A1 and/or A1(a) through A1(y).

13.   B, B1 and/or B1(a) through B1(vv).

14.   C, C1 and/or C1(a) through C1(i).

15.   C4.

16.   C5.

17.   D, D1 and/or D1(a) through D1(e).

18.   D4.

19.   D5.

20.   E and E1.

21.   E and E2.

22.   E and E3.

9

## TWENTY-THIRD THROUGH THIRTIETH SPECIFICATIONS

## NEGLIGENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6530(3) by practicing the profession of medicine with negligence on more than one occasion as alleged in the facts of

23.    A and A2.

24.    A and A 3.

25.    A and A4.

26.    B and B2.

27.    B and B3.

28.    B and B4.

29.    C and C2.

30.    D and D2.

## THIRTY-FIRST THROUGH THIRTY-EIGHTH SPECIFICATIONS

## INCOMPETENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6530(5) by practicing the profession of medicine with incompetence on more than one occasion as alleged in the facts of:

31.    A and A2.

10

32.   A and A3.

33.   A and A4.

34.   B and B2.

35.   B and B3.

36.   B and B4.

37.   C and C2.

38.   D and D2.

## THIRTY-NINTH SPECIFICATION

### EXERCISING UNDUE INFLUENCE

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6530(17) by exercising undue influence on the patient in such manner as to exploit the patient for the financial gain of the licensee or of a third party, as alleged in the facts of:

39.   A, A3 and A3 (a).

## FORTIETH SPECIFICATION

### ORDERING EXCESSIVE TREATMENT

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6530(35) by ordering excessive treatment not warranted by the condition of the patient, as alleged in the facts of:

11

40.    B and B3.

## FORTY-FIRST THROUGH FORTY-SECOND SPECIFICATIONS

### FAILING TO COMPLY WITH RECORD REQUESTS

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6530(28) by failing to respond to a written communication from the Department of Health to make available relevant records, as alleged in the facts of:

41.    C and C3.

42.    D and D3.

## FORTY-THIRD SPECIFICATION

### MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6530(20) by engaging in conduct in the practice of the profession of medicine that evidences moral unfitness to practice as alleged in the facts of the following:

43.    A, A1(a)-A1(y), A3(a) A(4), B, B1(a)-B1(vv), B3, C, C1(a)-C1(i), C4, C5, D, D1(a)-D1(e), D4, D5, E1, E2 and/or E3.

DATE: April 27, 2018
        New York, New York

Henry Weintraub
Counsel
Bureau of Professional Medical Conduct

13

E
X
H
I
B
I
T

C

# EXHIBIT C



E
X
H
I
B
I
T

D

# EXHIBIT D



E
X
H
I
B
I
T

E

# EXHIBIT E



**E**

**X**

**H**

**I**

**B**

**I**

**T**


**F**

# EXHIBIT F

